um

AO 91 (Rev. 11/11) Criminal Complaint | AUSA Yasmin N. Best (312) 469-6024

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

SEP 19 2016 EW

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

CHRISTOPHER WELLS,
also known as "Zaca"

CASE NUMBER:
**UNDER SEAL**

16CR 593

MAGISTRATE JUDGE KIM

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about March 2, 2015, in the Northern District of Illinois, Eastern Division, the defendant violated:

**Count One**

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 846 | Defendant knowingly and intentionally attempted to possess a controlled substance, namely 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance. |

**Count Two**

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 922(g) | Defendant, previously having been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess in and affecting interstate commerce a firearm, namely, (a) a Taurus 357 caliber revolver bearing serial number OE258372; (b) a Taurus PT145 Pro 45 caliber semi-automatic handgun bearing serial number NE082652; (c) a Llama Max-I 45 caliber semi-automatic handgun bearing serial number 07-04-11509-96; (d) a Delaware Machinery rifle bearing serial number R006293; and (e) a Maverick by Mossberg Model 88 12 gauge shotgun bearing serial number MV36982G, which firearms had traveled in interstate |

commerce prior to defendant's possession of the firearms, in violation of Title 18 United States Code, Section 922(g)(1).

This criminal complaint is based upon these facts:

X Continued on the attached sheet.

BRANDON RODEKOHR
Special Agent, Drug Enforcement Administration (DEA)

Sworn to before me and signed in my presence.

Date: September 19, 2016

*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT | ss
NORTHERN DISTRICT OF ILLINOIS |

## AFFIDAVIT

I, BRANDON RODEKOHR, being duly sworn, state as follows:

## I. Introduction

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been so employed for approximately 1 and a half years. Prior to my employment with the DEA, I was employed as a police officer with the Chicago Police Department for approximately 8 and a half years. I am an investigative and law enforcement officer of the United States, empowered by law to conduct investigations of and to make arrests for, offenses enumerated in the Comprehensive Drug Abuse Prevention and Controlled Substances Act of 1970, Title 21, United States Code, Section 801 *et seq*. I am currently assigned to an enforcement group within DEA's Chicago Field Division.

2. The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal and local law enforcement officers ("LEOs"); (c) laboratory analysis reports; (d) surveillance reports; (e) criminal history records; (f) information from cooperating sources; and (g) my training and experience and the training and experience of other law enforcement agents.

3. This affidavit is submitted in support of a criminal complaint alleging that Christopher Wells has violated Title 21, United States Code, Section 846, and

Title 18, United States Code, Section 922(g). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging WELLS with attempted possession of a controlled substance, namely 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, and possession of a firearm by a felon, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

## II. PROBABLE CAUSE

### A. Background and Information Provided by Confidential Sources

4. In or about April 2014, DEA's El Paso Division initiated the investigation into suspected drug trafficking activities of a number of Texas-based individuals. In or about May 2014, an individual (hereinafter "CS-1") began cooperating with the DEA in El Paso regarding his/her participation in transporting a load of cocaine for a suspected drug trafficker (hereafter "Individual B").[1]

5. In May 2014, as part of that cooperation and at the direction of law

[1] CS-1 has been documented as a confidential source with the El Paso Sheriff's Office ("EPSO") and El Paso Division of the Federal Bureau of Investigation since approximately March 2014. During his/her tenure as a confidential source, CS-1 has provided EPSO and FBI with credible information, corroborated through surveillance operations, that has resulted in the seizure of drugs. Since May 2014, CS-1 has been a confidential source for the DEA, and has provided information regarding an unrelated DEA investigation, which has been corroborated through surveillance operations, controlled deliveries, and controlled telephone calls, that has resulted in the seizure of drugs and drug proceeds. CS-1 is assisting the DEA and FBI for monetary compensation and is assisting EPSO for immigration benefits. CS-1 has a criminal history that includes convictions for possession of a controlled substance with intent to deliver and immigration offenses.

enforcement, CS-1 had a series of calls with an individual ("Individual A") who represented that he/she worked for Individual B. As a result of those conversations, at the direction of law enforcement, CS-1 coordinated the transportation of 10 kilograms of cocaine from Mexico to the United States in May 2014 that was provided by Individual A. The kilograms of cocaine were recovered by law enforcement in Texas as part of the controlled delivery.

6. As part of the ongoing investigation, over the next several months, CS-1 had a number of telephone calls with Individual B. During those conversations, CS-1 and Individual B discussed additional overland deliveries of cocaine from Mexico into the United States. As a result, between September and December 2014, CS-1 coordinated the delivery of an additional 40 kilograms of cocaine and 10 kilograms of heroin, which were seized by law enforcement as part of the controlled deliveries.

7. Between July 2014 and September 2015, the El Paso Divisions of DEA and FBI also worked with a second confidential source (hereinafter "CS-2") who was cooperating with law enforcement in exchange for consideration in any charging decision. During the course of his/her cooperation, CS-2 provided information regarding CS-2's involvement in the drug trafficking organization ("DTO") that CS-2 stated was run by Individual B. According to CS-2 and based on information gained through his/her cooperation, agents determined that Individual B was operating a DTO in Ciudad Juarez, Mexico, with the assistance of Individual B's uncle and other unknown individuals. According to CS-2, CS-2's role in the DTO was to store cocaine for the DTO and subsequently distribute the cocaine to another person, thus

insulating CS-2 from other members of the DTO.[2]

8. In order to preserve the integrity of the investigation, neither CS-1 nor CS-2 was told that the other was cooperating with law enforcement.

**B. WELLS's Attempted Possession of Cocaine in the Northern District of Illinois**

9. As part of CS-1's cooperation, DEA coordinated a delivery of cocaine to the greater Chicago area for March 2015. Specifically, according to CS-1, on February 23, 2015, CS-1 received a telephone call, which was not recorded, from Individual B in which Individual B asked CS-1 to transport 20 bundles of cocaine to Chicago, Illinois. According to CS-1, CS-1 told Individual B that he/she would have a truck driver transport the 20 kilograms of cocaine to Chicago.

10. According to CS-2, on or about February 24, 2015, CS-2 received a message[3] from Individual B in which Individual B told CS-2 that 20 kilograms of cocaine in CS-2's possession would be transported and instructed CS-2 to deliver the bundles to CS-1.

11. According to CS-2, at the direction of law enforcement, on February 25, 2015, CS-2 placed a telephone call to CS-1 in which CS-2 provided the location of his/her unlocked vehicle in El Paso so that CS-1 could retrieve the narcotics from the

---

[2] CS-2 was documented as a confidential source for the El Paso Divisions of DEA and FBI from July 2014 to September 2015, and was deactivated after exhaustion of CS-2's information. CS-2 provided credible information regarding this investigation that was corroborated through surveillance, monitored telephone calls, court-authorized electronic intercepts, multiple drug seizures, and information provided by cooperating defendants.

[3] CS-2 communicates with Individual B through messages over Facebook and via the telephone application WhatsApp.

vehicle. According to CS-1, at the direction of law enforcement, CS-1 placed an unrecorded call later that day to Individual B stating that CS-1 had retrieved the narcotics.[4] CS-1 also told Individual B that a truck driver working for CS-1 would depart El Paso on Friday, February 27, and arrive in St. Louis, Missouri late on Saturday, February 28. CS-1 further advised Individual B that the driver would depart St. Louis late Sunday, March 1, and arrive in Chicago on Monday, March 2, to meet with the Chicago recipient. According to CS-1, Individual B did not provide any information about the individuals to whom CS-1 was to deliver the cocaine.

12. On February 27, 2015, according to CS-1, CS-1 conducted a series of text messages with Individual B. According to CS-1, he/she told Individual B that the truck containing the 20 kilograms of cocaine was "out of danger," meaning that the truck had passed the last check point outside the city of El Paso and was en route to Chicago.

13. On March 2, 2015, CS-1 spoke to Individual B by telephone. During the call, which was unrecorded, CS-1 informed Individual B that the truck driver was in Chicago. Individual B provided CS-1 with telephone number (312) 843-8100 for a person Individual B identified as "Zaca." Individual B instructed CS-1 to have the truck driver call Zaca to arrange the delivery of the 20 kilograms of cocaine in Chicago.

14. In preparation for the delivery of the sham narcotics to "Zaca," agents

[4] Because both CS-2 was cooperating with law enforcement, the bundles in CS-2's possession that were retrieved by CS-1 contained sham cocaine and did not contain any narcotics.

sought court-authorization to insert a tracking device in the sham narcotics. On March 2, 2015, Chief Judge Rubén Castillo of the District Court for the Northern District of Illinois signed a court order permitting the installation and use of a tracking device, to be inserted with the sham narcotics, for a period of 30 days.

15. On March 2, 2015, a law enforcement agent acting in an undercover capacity ("the UC") placed two calls to Zaca at telephone number (312) 843-8100. During the calls, which were recorded, the UC (who was acting as the truck driver working for CS-1) and Zaca agreed to meet that day at 4:00 p.m. in the south parking lot of a Portillo's restaurant so that the UC could distribute the narcotics to Zaca. The UC and Zaca also discussed the vehicle they would be arriving in.

16. At approximately 3:45 p.m., agents established surveillance in the parking lot of a Portillo's restaurant, located at 5532 South Harlem Avenue in Summit, Illinois.

17. At approximately 3:55 p.m., the UC arrived at the Portillo's parking lot in an undercover vehicle. The UC had in the undercover vehicle a black duffle bag containing 20 bundles of sham cocaine, as well as the tracking device.

18. At approximately 4:00 p.m., surveillance observed a tan GMC Tahoe, bearing Illinois registration number A833088,[5] arrive at the Portillo's parking lot and park next to the undercover vehicle. An individual later identified as CHRISTOPHER

[5] The GMC Tahoe was registered to Individual X, WELLS's girlfriend, who is discussed in further detail below.

WELLS[6] exited the Tahoe and entered the front passenger seat of the undercover vehicle.

19. Once inside the vehicle, WELLS and the UC had a brief discussion, which was recorded. During the transaction, the UC retrieved the black duffle bag from the rear of the vehicle and placed the bag between the front seats. WELLS then opened the bag and asked, "How many is it?" The UC told WELLS that there should be over 20, meaning kilograms of cocaine. WELLS responded, "Shit, I thought he said ten [kilograms]." The UC stated, "There ain't no ten." WELLS then took the black duffle bag, exited the undercover vehicle, reentered the Tahoe, and left the area.

20. Agents then conducted mobile surveillance of WELLS as he drove the Tahoe to a trailer park located southwest of 87th Street and Harlem Avenue in Bridgeview, Illinois. At approximately 4:20 p.m., agents approached WELLS and placed him under arrest. Agents observed the black duffle bag on the floor behind the driver's seat.

21. Agents then searched WELLS and the Tahoe. During a search of the Tahoe, agents recovered a Samsung telephone with the telephone number (312) 843-8100, which matched the telephone number used by "Zaca" during the conversation with the UC earlier that day.

[6] WELLS was subsequently identified after his arrest by an Illinois driver's license in that name. Agents also reviewed the recorded telephone calls with between the UC and Zaca and the undercover video/audio recording with WELLS on March 2, 2016. Based upon the comparison of those recordings, agents determined that WELLS is "Zaca" and the person who conducted the recorded calls.

**C. Consent Search of Bridgeview Residence**

22. On March 2, 2015, agents also conducted surveillance at a residence located in a mobile home park on the 8800 block of South Harlem Avenue in Bridgeview, Illinois (the "Bridgeview Residence"). The Bridgeview Residence was identified by law enforcement as a possible residence connected to or used by WELLS. Specifically, agents determined that the Chevrolet Tahoe driven by WELLS was registered to Individual X at an address in Justice, Illinois. Further review of law enforcement databases revealed a second possible address for Individual X at the Bridgeview Residence, which was the same mobile home park at which WELLS was arrested.

23. At approximately 5:20 p.m., agents approached a woman ("Individual X") who resides at the Bridgeview Residence. Agents informed Individual X that WELLS was arrested in a drug investigation. Agents then asked Individual X if she would consent to a search of the Bridgeview Residence. Individual X verbally consented and then signed a written consent form.

24. During the consent search, agents located a yellow and black bag in a closet the west bedroom of the Bridgeview Residence. Inside of the bag, agents recovered the following: (a) a Ziploc bag with an approximate weight of 913.7 grams and containing a white powdery substance that resembled suspect cocaine ("Exhibit A"); (b) 2 plastic bags with an approximate weight of 151.2 grams and containing a chunky off white substance that resembled suspect crack cocaine ("Exhibit B"); (c) 2 plastic bottles with a total approximately weight of 180.1 grams and containing

powdery substances; and (d) 5 scales and a silver covered spoon, all of which contained a film of a white residue resembling suspect cocaine. Subsequent lab results obtained from the DEA laboratory showed that Exhibit A contained approximately 873.4 grams of powder cocaine and that Exhibit B contained approximately 112.3 grams of cocaine base (crack cocaine).

25. Agents also recovered a mason jar with a total approximately weight of 320.7 grams from the drawer of a dresser in the west bedroom. Agents recovered from inside of the mason jar a plastic baggie contain a green leafy substance that resembled suspect marijuana. Also recovered from the dresser was $13,000 in U.S. currency.

26. Agents also recovered five firearms and associated ammunition during the consent search. Specifically, agents recovered from the west bedroom: (a) a Taurus 357 caliber revolver bearing serial number OE258372 and five rounds of live ammunition; (b) a Taurus PT145 Pro 45 caliber semi-automatic handgun bearing serial number NE082652 with a magazine and nine rounds of live ammunition; and (c) a Llama Max-I 45 caliber semi-automatic handgun bearing serial number 07-04-11509-96 with two magazines and 12 rounds of live ammunition; and (d) a Delaware Machinery rifle bearing serial number R006293. Agents recovered from a closet in the west bedroom from which the narcotics were also recovered: (e) a Maverick by Mossberg Model 88 12 gauge shotgun bearing serial number MV36982G. A review of law enforcement databases indicated that the Taurus PT145 Pro 45 caliber semi-automatic handgun and the Maverick by Mossberg Model 88 12 gauge shotgun were

both reported stolen.

27. After the consent search, agents interviewed Individual X, who was informed that she was not under arrest and was free to leave at any time. During the interview, agents asked Individual X how the firearms had been transported to the Bridgeview Residence. Individual X stated that she had never seen the firearms and that neither she nor her children had brought the firearms to the Bridgeview Residence. Individual X concluded that it must have been "him," which agents understood to mean WELLS. When asked whether her fingerprints would be found on the firearms, Individual X stated that they would not.

28. Agents asked Individual X how often WELLS visited the Bridgeview Residence. Individual X stated that WELLS was in and out of the Bridgeview Residence and stayed over an average of two times per week, and that WELLS had unrestricted access to the home. Individual X stated that WELLS had last stayed overnight on February 28, 2015, but that WELLS had visited the Bridgeview Residence earlier on March 2, 2015, after which WELLS and Individual X ran various errands.

29. Agents also conducted an interview of Individual X's adult daughter, Individual Y, outside of the Bridgeview Residence. Agents asked Individual Y how often WELLS visited the Bridgeview Residence. Individual Y told agents, "He always stays here."

**D. WELLS's Post-Arrest Interview**

30. After his arrest, agents orally advised WELLS of his *Miranda* rights.

WELLS informed agents that he was aware of his *Miranda* rights and wanted to speak with agents. During the interview, agents asked WELLS if he lived at the Bridgeview Residence. WELLS stated that he did not. Agents asked WELLS why he had a key to the Bridgeview Residence.[7] WELLS stated that he drops by the Bridgeview Residence from time to time.

31. Agents informed WELLS that firearms, ½ to 1 kilogram of cocaine, and a large amount of currency had been found during a search of the Bridgeview Residence. When asked whether the cocaine and firearms belonged to Individual X, WELLS stated that they did not and that Individual X had nothing to do with the firearms or cocaine. WELLS then admitted that the firearms, cocaine, and currency belonged to him.

32. A review of NCIC criminal history documents revealed that on or about March 13, 2008, WELLS was convicted of the felony offense of possession of 100 to 400 grams of cocaine in the Circuit Court of Cook County, Illinois, and sentenced to 8 years' imprisonment.

## III. CONCLUSION

33. Based on the foregoing, I believe there is probable cause to believe that on March 2, 2015, CHRISTOPHER WELLS did knowingly and intentionally attempt to possess a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled

[7] During WELLS's arrest, agents found keys on his person. During the consent search, agents determined that one of the keys opened the door locks at the Bridgeview residence.

Substance, in violation of Title 21, United States Code, Section 846, and possession of a firearm by a felon, in violation of Title 18, United States Code, Section 922(g).

FURTHER AFFIANT SAYETH NOT.

BRANDON RODEKOHR
Special Agent,
Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on September 19, 2016.

YOUNG B. KIM
United States Magistrate Judge